UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| WILLIAM WIGGIN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:13-cv-00081-JAW |
| | ) | |
| AETNA LIFE INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant | ) | |

## RECOMMENDED DECISION

This action arises under the jurisdictional provision of the Employee Retirement Income Security Act, 29 U.S.C. § 1132(e), and presents a civil action pursuant to 29 U.S.C. § 1132(a) to recover long-term disability benefits provided in an employee welfare benefit plan. Both parties seek a case-dispositive order from the Court on cross-motions for judgment on the administrative record. The Court referred their motions for report and recommendation. I now recommend that the Court award judgment in favor of the defendant.

## FACTS

The following recitation of the background facts relies, in part, on the factual statements and record references offered by the parties. In support of its motion, Aetna filed a lengthy appendix of factual statements drawing on the administrative record. William Wiggin did not file an appendix of factual statements in support of his motion, but has directed the Court's attention to certain portions of the record in a brief background section of his motion. The Court's review of the record is not necessarily restricted to the parties' factual statements, but the Court's review is guided by the parties.


William Wiggin was the regional manager of Community Health and Counseling Services between 2001 and 2010 and participated in CHCS's Group Life and Accident and Health Plan. Benefits under the Plan are funded by an Aetna insurance policy and the Plan grants Aetna "discretionary authority to determine whether and to what extent eligible employees and beneficiaries are entitled to benefits and to construe any disputed or doubtful terms under th[e] Policy." (AR 16.[1])

The plan includes a benefit provision for long-term disability (LTD). LTD benefits are available to participants who are disabled and unable to work due to illness or injury. (27.) LTD benefits are provided for the first 24 months of disability if two conditions are met: (1) the claimant must be unable to perform the material duties of his "own occupation" solely because of illness or injury and (2) earnings must not exceed 80% of the claimant's "adjusted predisability earnings." (Id. at 28.) After the 24-month period ends, the requirement for qualifying as disabled is more difficult to meet. The claimant must be unable to work at "any reasonable occupation" solely because of illness or injury. (Id.) "Reasonable occupation" is a defined term meaning any gainful activity for which the claimant is or may reasonably become fitted by education, training, or experience that results or can be expected to result in income of greater than 60% of adjusted predisability earnings. (Id. at 46.) LTD benefits end under the plan when, among other things, "you fail to provide proof that you meet the LTD test of disability." (Id. at 29.)

Mr. Wiggin filed a claim for LTD benefits on April 21, 2010, based on rectal pain/perianal pain due to fissures and scarring and based on anxiety. (54-55, 104.) Wiggin provided Aetna with his then-existing medical records in May 2010. The records contain

---

[1] All citations are to the Administrative Record, unless otherwise indicated. Page citation is to the "Wiggin" page number at the bottom right of the page.

treatment notes from Husson Family Medicine, where Wiggin primarily treated with Family Nurse Practitioner (FNP) Diane James.  (406-452, 648-683.)  They also include medical records referencing surgical treatments and procedures in 2004, proctology examinations and procedures performed by Dr. Brian Gillis, MD, in 2007, 2009, 2010, and 2011, and surgical consults between 2006 and 2010.  (Id. at 507-573.)  In addition, Wiggin initiated treatment at Acadia Hospital on February 3, 2010, for medication management services and for a psychiatric review of his medications.  (Id. at 872-79.)

In terms of medical records addressing Wiggin's vocational readiness, Dr. Brian Gillis, MD, specializing in proctology, authored a letter dated May 8, 2010, addressed to FNP James, in which he asserted that "due to the protracted nature of his overlying anxiety disorder as it integrates with a functional gut disorder and his anorectal complaints, [Wiggin] is currently unable to facilitate employment to any fair degree."  (Id. at 866.)  In a May 11, 2010, "to whom it may concern" letter, FNP James indicated that Wiggin should only work 8-10 hours per week due to anxiety and severe rectal pain.  (Id. at 868.)  FNP James reiterated this disability assessment on June 21, 2012, in a letter addressed to Aetna.  (702.)  However, Dr. Gillis did not issue a similar statement in the 2012 timeframe.

Dr. Gillis examined and treated Wiggin for his anorectal condition in 2007 and regularly in 2009 and 2010.  On referral from FNP James, Dr. Gillis examined Wiggin and reviewed his surgical history and, initially, recommended various conservative modalities that did not succeed in fully alleviating Wiggin's symptoms.  Dr. Gillis described the underlying condition as chronic and recurrent rectal and GI-related disease of moderate severity.  (509, 516, 521, 526.)  In March 2010, Dr. Gillis increased the severity assessment to severe.  (531.)  In a May 2010 letter to FNP James, Dr. Gillis reported that a surgical approach was a viable alternative going forward.  (488.)

There is an indication in the administrative record that "anal fissure surgery" was performed sometime in 2011 (605), but neither party has directed the Court to where the surgical report(s) can be found.  Dr. Gillis performed an anorectal manometry on November 11, 2011.  (635.)  He diagnosed anorectal organic muscle dysfunction.  (Id.)  His post-procedure assessment states: "Improvement of disease specific health related quality of life has subjectively improved by good improvement of 80% from baseline."  (636.)

In an initial triage review of the claim performed in May 2010, Aetna concluded that the records supported the LTD claim because Wiggin's job required him to sit for long periods of time.  (Id. at 72.)  Aetna formally approved Wiggin's claim for the 24-month benefit in a June 9, 2010, determination, establishing the "benefit begin date" of April 20, 2010.  (Id. at 92-93.)  The decision was based on Wiggin's need to sit for long periods at work and to travel, which "would preclude [him] from performing his own occupation through the end of June."  (Id. at 94.)  Aetna noted the presence of the anxiety diagnosis and flagged it for review and as a condition requiring the care of a psychiatrist.  (Id.)  Aetna notified Wiggin of its determination by letter dated June 18, 2010.  (Id. at 335-36.)  The letter notified Wiggin that he was found disabled for purposes of the 24-month benefit and would have to meet "a more strict definition of disability" if he were still disabled from his own occupation as of April 21, 2012.  (Id. at 335.)

In August 2010, a "BHU[2]" case manager looked into Wiggin's claim insofar as it alleged disability on mental health grounds.  The case manager spoke with Wiggin on August 30, 2010, and learned that Wiggin was not currently being treated by a mental health provider.  (Id. at 135.)  Aetna obtained a Behavioral Health Clinician Statement from FNP James on September 1, 2010.  (Id. at 646-47.)  Based on the Statement and follow up with James, a case manager concluded

---

[2]   I believe this means behavioral health unit.

that the clinical information did not support a finding of psychological functional impairment as of April 2010. (148.) In November 2010, Wiggin reported to a BHU case manager in conversation that surgery was scheduled for later that month and that he feared the surgery might make him incontinent. (153.) He indicated that the thought of not being able to work increased his anxiety. (Id.)

Spring and summer of 2011 are something of a void, at least in those portions of the record cited by the parties. Additionally, it is not perfectly clear when Dr. Gillis performed surgery, though it appears that he performed surgical procedures in December 2010 (the sphincterotomy and an advancement flap procedure referenced below).

On or after October 10, 2011, Wiggin learned that he was awarded Social Security Disability Income benefits by the Social Security Administration and he notified Aetna of this fact. (Id. 181-82, 816-23.)

On October 26, 2011, Aetna notified Wiggin that the 24-month period of "own occupation" LTD benefits would be ending following a payment to be issued on April 20, 2012, and that he must be considered disabled from any gainful occupation to continue receiving LTD benefits after that date. (349.) Aetna indicated that it would review the available medical and vocational information and that Wiggin could forward additional medical and vocational information that he would like Aetna to consider. (350.)

In 2011 Wiggin obtained a course of mental health treatment with Jesse Higgins PMH-NP at Acadia Hospital. In a December 2011 progress note, Higgins recorded Wiggin's subjective report that his depression and anxiety were well-managed, that he suffered no side-effects from medication, the use of two clonazepam for pain in the past three months, and only rare use of Ambien when he needed to "re-set" his sleep. Wiggin also reported that with the

5

medication Cymbalta he no longer just stayed home feeling sorry for himself and was walking a mile and a half daily. (749.)

Anne Girardot, a registered nurse in Aetna's employ, reviewed the Wiggin file and updated it on April 23, 2012, with a notation that Wiggin's "current functional status is not clear; the documentation supports sitting on only an occasional basis due to pressure and strain on an area which is surgically altered. Lifting from the floor to waist is also contraindicated." (218.) Girardot indicated she would perform outreach to Dr. Gillis and FNP James to determine current status and capabilities. (Id.) Katherine Quinby, another registered nurse in Aetna's employ, recommended that the medical records did not support functional impairment that would preclude sedentary/light work activity and noted that efforts to get functional impairment information from Dr. Gills and FNP James had been unsuccessful. Nurse Quinby opined that a sit/stand work station may be required, but recommended "surgical peer review with peer to peer outreach to clarify functionality." (239.) On May 9, 2012, Aetna authorized a peer review noting the "need to close the loop between clinical review that states medical sources do not support functional impairment from sed/light work activity and claimant's Dr[3] who states he is unable to sit and perform full time work." (242.)

Aetna sought the peer review through third-party vendor MES Solutions, which referred the matter to Dr. Paravasthu Ramanujam, MD, board certified in colon and rectal surgery with expertise in proctology. In a report dated June 7, 2012, Dr. Ramanujam noted that the medical records indicated that Wiggin had two hemorrhoidectomies "years ago" (circa 2004) and anal fissure surgery one year ago. (706.) Dr. Ramanujam reported that the records did not include documentation of any anorectal examinations, and accordingly, no clinical findings were present.

---

[3]    This appears to be a reference to FNP James. Wiggin has not identified a disability-supportive statement from Dr. Gillis made in the 2012 timeframe.

He further reported that an EMG note dated November 8, 2011, indicated that Wiggin's preoperative diagnosis was "incontinence of feces, muscle atrophy, and disuse" with a postoperative diagnosis of "muscle atrophy/disuse improving and fully incontinent of feces [stable]" and positive for anorectal organic muscle dysfunction.  (Id.; see also Dr. Gillis's EMG note dated Nov. 8, 2011 (797-798).)  Dr. Ramanujam conducted a peer-to-peer consultation with Dr. Gillis about this EMG report.  (707.)  Dr. Gillis advised Dr. Ramanujam that he performed a sphincterotomy and an advancement flap procedure on Wiggin, after which he noted that Wiggin "significantly improved."  (Id.)[4]  Dr. Gillis also stated that his office notes from December 2010 showed that Wiggin had "minimal to no anorectal pain, [and] no significant problems with incontinence at that time."  (Id.)  Dr. Gillis read the anal manometry report to Dr. Ramanujam, who concluded that the results were "consistent with the claimant having had previous rectal operations but not consistent with the claimant having anal incontinence."  (Id.)  Dr. Gillis told Dr. Ramanujam that he did not find anything on the EMG or anal manometry to explain Wiggin's pain or anal incontinence, and stated that he was unsure what was causing his anorectal discomfort or anal incontinence.  (Id.)  Based on his review, Dr. Ramanujam concluded that "[f]unctional impairment is not supported from 04/01/2012 through present."  (Id.)  Although abnormalities were present on the EMG studies, Dr. Ramanujam opined that "it is very difficult to correlate the EMG findings with the claimant's actual symptoms."  (Id.)  According to Dr. Ramanujam, "The only record I see that states his preoperative symptoms . . . are from the EMG note.  Other physicians' notes only state the claimant is having rectal pain but there are no physical findings."  (707.)

---

[4]  The citation is to a report by Dr. Ramanujam, rather than to a surgery/procedure-specific report by Dr. Gillis, which I have been unable to locate in the record.

As part of his review, Dr. Ramanujam also contacted Husson Family Medicine, where FNP James practices. However, as part of this peer review, Dr. Ramanujam spoke with Dr. Vincent Michaud and not with FNP James. Dr. Michaud never treated Wiggin, but quickly reviewed Wiggin's chart and informed Dr. Ramanujam that treatment focused on anxiety, depression, and sleep problems and that different medications were tried with some benefit and that none of the medications they prescribed were the cause of Wiggin's anorectal pain. (707, 709.)

FNP James disputed Dr. Ramanujam's peer review report by letter dated June 21, 2012. (709.) She wrote as Wiggin's primary care provider and indicated, among other things, that her primary focus had been to address "depression and anxiety which was exacerbated by having chronic rectal pain and not being able to work full time." (Id.) FNP James also indicated that Wiggin's rectal issues were being addressed by Dr. Gillis. (Id.) She indicated that Wiggin was only able to work for CHCS four hours per week due to rectal pain and that she disputed Dr. Ramanujam's opinion that Wiggin could perform full-time sedentary work. (Id.)

Wiggin authored his own letter to Aetna on June 15, 2012, "in response to your telephone call to me on June 12, 2012 regarding Aetna's . . . decision." (711.) Wiggin's letter provides a long-term history of the development and progress of his condition, including the ways in which his rectal-pain and medication-related symptoms impact his work performance, including by restricting his ability to sit, reducing his cognitive functioning, and interfering with his sleep. (711-719.) In addition to these representations, Wiggin reported that he had an appointment in July with Dannel Starbird, Ph.D.,[5] a clinical psychologist, and he requested additional time to

---

[5] In his motion, Wiggin cites pages 622-634 and 775-793 of the record in reference to the treatment notes of Dr. Starbird. These pages contain handwritten notes that are only partially legible. The notes contain no actual

supplement his file so he could "meet with [his] medical providers [to] better understand why they believe that I am not disabled and can be gainfully employed." (719.)

On July 5, 2012, Aetna referred the file once more to Dr. Ramanujam to address updates to the file. Among other information, Dr. Ramanujam had Wiggin's letter and also spoke with FNP James, who reported feeling strongly that Wiggin was disabled by rectal pain, whether or not the objective findings are contained in Dr. Gillis's treatment notes. (699.) In his addendum report dated July 26, 2012, Dr. Ramanujam wrote that he maintained his earlier opinion based primarily on Dr. Gillis's uncertainty as to what was causing Wiggin's anorectal pain or incontinence, while also noting that FNP James had not offered information to alter his earlier opinion. (700.) Ultimately, it is Dr. Ramanujam's opinion that Wiggin has "no functional impairment." (Id.)

On July 27, 2012, an Aetna employee entered a note in the electronic case file to terminate benefits. (284.) LTD Benefit Manager Molly Montgomery issued a letter decision to Wiggin on August 9, 2012. (591.) After recounting the medical records in the file, Montgomery articulated the following rationale for the decision:

> In summary, neither your treating providers nor you have provided additional medical support of a disability due to a physical condition and/or mental health condition. Based on the provided documentation and telephone conversation, there are no physical or cognitive examination findings of any functional impairment suggesting that your ability to work has been impacted. The clinical record does not support limitations and restrictions from performing your own occupation, or any other occupation for which you might qualify on a full time basis.

(593.) In effect, Aetna found that Wiggin failed to demonstrate that he cannot perform the duties of his CHCS job on a full-time basis. Montgomery acknowledged that Wiggin was approved for

---

reference identifying them as the notes of Dr. Starbird and do not appear to include any clinical findings. If there are clinical findings in the notes, Wiggin has not stated what those findings were.

social security disability benefits, but explained that Aetna was not giving that determination significant weight because it could have been based on Social Security Administration regulations and because the basis for the decision was not provided to Aetna. (594.)

Wiggin pursued an administrative appeal on October 12, 2012. In the appeal form, he recited his limitations, explaining that his condition makes him unable to perform his own job for more than four hours per week, in part because his symptoms are unpredictable, but also because the medicines he needs to take to attend work at the office impair his thinking and make it unsafe to drive. Even with these medications, Wiggin denied the capacity to engage in full-time employment in a sedentary or light-work occupation. (693.) He summarized:

> I have been and am struggling from a disability that prevents me from engaging in gainful employment. My doctors agree with me, social security agrees with me, my friends, family, employer agree with me. You folks are the only ones who don't agree with me because of a doctor you hired who never observed or examined me.

(Id.) Aetna notes that in his letter Wiggin also reported traveling two hours one way in a car to attend his mother's funeral, stating that it "almost did [him] in" and required "a bottle of hydrocodone to manage the pain and a bottle of clonazepam to manage the associated anxiety." (691.)

Wiggin's appeal came before Linda Camacho of Aetna's Appeals Unit. (296.) Camacho referred the file for additional peer review to Leonard Schnur, PsyD, board certified in psychology, and Armand Katz, MD, board certified in general surgery.

Dr. Schnur provided a report dated October 26, 2012. (401-404.) Aetna requested that he determine if Wiggin has a psychological impairment that would have precluded his performance of "any occupation" from July 28, 2012, through October 23, 2012. (402.) Dr. Schnur's primary critique of the medical file was with the "lack of examination findings to

substantiate a functional impairment across cognitive, emotional, and behavioral spheres which would have precluded the claimant from performing the work of any occupation for the time period 7/28/12 through 10/23/12." (403.) He concluded that "[f]rom a psychological standpoint . . . functional impairment was not substantiated [and] no restrictions or limitations would have been needed" and that the clinical records "did not substantiate any adverse medication effect impacting functionality from either a cognitive or physical standpoint." (Id.)

Dr. Katz returned his report on November 28, 2012. (395-98.) In his report he indicated a peer-to-peer consultation with Dr. Gillis in which Dr. Gillis opined "that by 7/28/12 the claimant would not have been disabled from his anorectal problems and did not have sufficient pain to create a disability secondary to the rectal pain." (397.) Based on his review of Wiggin's medical records and his peer-to-peer consultation with Dr. Gillis, Dr. Katz opined that these materials failed to support any functional impairment as of July 28, 2012. (397.) He noted that "[t]here is no documentation during that period [that] the claimant had any significant problems with his rectal pain or problems." (Id.) Dr. Katz further opined that Wiggin "could have been able to perform at any physical demand rating based on a general surgical point of view." (Id.) Dr. Katz also reported that he found no evidence of any adverse medication effect that would result in functional impairment. (398.)

By letter dated December 5, 2012, Aetna advised Wiggin that it had completed its appeal review and that it was upholding the original adverse benefit determination. (931-933.) Aetna summarized:

> [William Wiggin] was authorized LTD benefits from April 21, 2010 through July 27, 2012. However, his LTD benefits were terminated effective July 28, 2012 as the medical information from his treating providers did not support a functional impairment that would have prevented him from performing work at any reasonable occupation as of July 28, 2012.

11

(932.)  Aetna then reviewed the case file, reciting much of the medical history already described herein.  Aetna's substantive decision was as follows:

> Based on our review of the information you provided, and as explained in detail above, we have determined that there was a lack of medical evidence (i.e. progress notes documenting abnormal physical exam findings, abnormal diagnostic testing, behavioral observations, psychological testing, etc.) supporting a functional impairment that would have prevented [Wiggin] from performing work at any reasonable occupation as of July 28, 2012.  Therefore, the original decision to terminate LTD benefits, effective July 28, 2012, has been upheld.

(932).

## STANDARD OF REVIEW

When a plan bestows upon the plan administrator discretion to construe its terms and make eligibility determinations, the default standard of review for a court is to uphold the administrative decision unless it is arbitrary, capricious, or an abuse of discretion.  <u>Cusson v. Liberty Life Assur. Co. of Boston</u>, 592 F.3d 215, 224 (1st Cir. 2010).  Benefits determinations are upheld so long as they are "reasoned and supported by substantial evidence."  <u>Gannon v. Metro. Life Ins. Co.</u>, 360 F.3d 211, 213 (1st Cir. 2004).  Substantial evidence is evidence "reasonably sufficient to support a conclusion, and the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary."  <u>Id.</u>

## DISCUSSION

The following discussion begins with consideration of the structural conflict of interest. Although the conflict exists in this case, Aetna has introduced evidence to the effect that it does not deserve special weight.  Wiggin has not made the structural conflict a focal point of his discussion, but I have addressed it because the Court of Appeals has indicated that it should not be overlooked.  The discussion then turns to Aetna's assertion that Wiggin's motion be denied based on his failure to provide the Court with a factual statement supportive of his position.

Because Wiggin included a brief factual statement in his motion, I see no reason to deny his motion on a procedural footing. Finally, the discussion addresses the core question of whether Aetna relied on substantial evidence in support of its benefit determination.

### A.     The Structural Conflict of Interest

It is undisputed that Aetna has a structural conflict of interest based on the fact that it has to pay with its own fund any claim it approves. However, "[t]he fact that [Aetna] will have to pay [Ganem's] claim out of its own assets does not change [the] standard of review." Glista v. UNUM Life Ins. Co. of Am., 378 F.3d 113, 125-26 (1st Cir. 2004). Instead, the conflict is a factor that the court must take into consideration. Cusson, 592 F.3d at 224 (citing Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008)). This factor generally proves less important "where the administrator has taken active steps to reduce potential bias and to promote accuracy." Id. In effect, the court considers as one factor that the administrator is laboring under a structural conflict of interest. Glenn, 554 U.S. 117.

"[C]ourts are duty-bound to inquire into what steps a plan administrator has taken to insulate the decisionmaking process against the potentially pernicious effects of structural conflicts." Denmark v. Liberty Life Assur. Co., 556 F.3d 1, 9 (1st Cir. 2009). "[P]lan administrators, aware of *Glenn*, can be expected as a matter of course to document the procedures used to prevent or mitigate the effect of structural conflicts. That information will be included in the administrative record and, thus, will be available to a reviewing court." Id. at 10.

Aetna has introduced evidence concerning its structural conflict through the Affidavit of Debra Comar. Ms. Comar is a claim manager for Aetna. She states that "it is Aetna's practice and intention to review such claims fairly, without regard to the manner in which the plan is funded, and to consistently award benefits on claims that are entitled to payment . . . while

13

consistently denying claims that are not entitled to such payments." (Comar Aff. ¶ 4.) She further attests that employees who determine claims presented by participants in ERISA-governed plans "are paid fixed salaries and performance bonuses, which are wholly unrelated to the number of claims paid or claims denied" (id. ¶ 6); that such employees are evaluated on the basis of the quality of their decisions (id. ¶ 8); that Aetna does not establish quotas for claim denials (id. ¶ 7); that Aetna does not discourage its employees from paying legitimate claims (id. ¶ 10); and that Aetna maintains a separate appeal unit for the consideration of denied claims on appeal, which unit exercises independent judgment and does not confer with the claims representative who initially denied the claim (id. ¶¶ 11-12). Ms. Comar further attests that Aetna's claims department operates separately and independently of Aetna's financial underwriters, with underwriters having no say in claims determination. (Id. ¶¶ 14-16.) Finally, Ms. Comar attests that the Chief Financial Officer of Aetna and his direct reports, including the Chief Financial Officer of Business Operations, the Chief of Staff and Finance, the Head of Corporate Finance, and the Chief Investment Officer, do not have any involvement whatsoever in claim decisions. (Id. ¶ 17.)

Linda Camacho, the senior appeal specialist who exercised final decision-making authority in her review of Mr. Wiggin's administrative appeal, has also submitted an affidavit. Ms. Camacho's affidavit is consistent with Ms. Comar's affidavit in that Camacho attests that she did not consider Aetna's financial interest or discuss the claim with anyone in Aetna's financial or underwriting departments. (Camacho Aff. ¶ 6.) She further states that her remuneration does not incentivize her to deny claims for long-term disability benefits. (Id. ¶ 7.)

The record reflects that Aetna operates under a structural conflict of interest. Based on the Comar and Camacho affidavits, the conflict does not appear to be heightened beyond what is

14

standard in this kind of arrangement. Although the conflict remains a factor for the court to consider, it does not deserve "special weight." Cusson, 592 F.3d at 228.

**B.** **The Lack of a Factual Statement by Wiggin**

The Scheduling Order in this case provided that the parties would file in support of their respective motions for judgment "an appendix setting forth a brief recitation of the facts, accompanied by record citations, upon which the moving party relies for the requested relief." (ECF No. 18 at 3.) Wiggin did not support his motion with such an appendix. Instead, he offered a brief factual recitation at the start of his motion and included some citations to the record.

Aetna argues that Wiggin's motion should be denied based on Wiggin's failure to present the Court with an appendix of factual statements. (Def.'s Response at 1-4, ECF No. 27.) If this case were being resolved on motions for summary judgment, I would certainly advise the denial of a motion that failed to comply with the requirements of Local Rule 56. Here, however, the cross-motions for judgment on the administrative record are not governed by Local Rule 56. Leahy v. Raytheon Co., 315 F.3d 11, 18 (1st Cir. 2002). In my view, Wiggin's failure to provide an appendix of supportive facts does not warrant judgment against him. However, if Wiggin fails to direct the Court's attention to an essential fact located somewhere in the 933-page administrative record, he has no cause to blame the Court for not finding it. In this way the sanction for noncompliance with the Scheduling Order is potentially self-executing. It is Wiggin's burden to demonstrate to the Court that Aetna abused its discretion when it discontinued his LTD benefits. Id. at 19.

### C.     Substantial Evidence

Wiggin asserts that proof of disability from any occupation is established by (1) the opinion of FNP James, who opined that Wiggin had only four hours of weekly work capacity based on "multiple consultations and examinations of Mr. Wiggin over the prior twenty six months, acting as his consistent PCP throughout the entire relevant timeframe" and her access to "voluminous third-party testing and assessment material contained within Husson Family Practice's chart"; (2) the fact that Wiggin "was at that time experiencing significant anxiety attacks, memory deficits, depression and socio-economic difficulties . . . as consistently reported to his relevant providers, Dr. Starbird and PMH-NP Higgins; and (3) Wiggin's own comprehensive descriptions of his symptoms, "which self-reported disability was not directly challenged by Aetna." (Pl.'s Motion at 5-6.) Assuming for the sake of argument that the foregoing evidence is capable of supporting a finding of disability to perform any full-time occupation, it is not the only evidence in the record. The record also contains substantial evidence that Wiggin's records do not reliably support a finding of disability. So long as there is substantial evidence in support of Aetna's benefit determination, this Court must uphold that determination. Gannon, 360 F.3d at 213.

With respect to Wiggin's assertion of psychological disability, the report of Dr. Schnur supports an administrative decision that the record lacks mental health findings that would "substantiate a functional impairment across cognitive, emotional, and behavioral spheres which would have precluded the claimant from performing the work of any occupation for the time period 7/28/12 through 10/23/12." (403.) This assessment appears to be unassailable insofar as Wiggin has not directed the Court to any contrary findings in his mental health records that predict psychological deficits that would preclude his performance of any particular work

functions. Wiggin does not even address Dr. Schnur's opinion in his motion. Instead, Wiggin observes that Dr. Katz, who was asked to perform a peer review to address Wiggin's physical conditions and the likely effects of related medication, made note in his peer review report of a May *2010* chart entry by Dr. Gillis stating that Wiggin was "currently unable to facilitate employment to any fair degree" due to combined effects of "protracted anxiety," a "functional gut disorder," and "anorectal complaints." (Pl.'s Motion at 8-9, citing AR 396.) Whatever Wiggin's condition may have been in 2010, Dr. Katz noted that in his 2012 peer-to-peer consultation with Dr. Gillis, Dr. Gillis himself opined that as of July 27, 2012, Wiggin would not have been disabled by anorectal problems or pain symptoms. (AR 397.) In any event, Dr. Katz's notation concerning Dr. Gillis's May 2010 opinion does not undercut Aetna's reliance on Dr. Schnur's report concerning what the mental health records predict in terms of vocational deficits. Dr. Schnur's peer review report is substantial evidence in support of Aetna's mental health related finding.[6]

Considering the underlying physical impairment, both Dr. Katz and Dr. Ramanujam concluded that the medical records did not reliably support a finding of physical disability and both reviewing doctors indicated that Dr. Gillis's own assessment, as of 2012, was consistent with theirs. Wiggin asserts that these opinions are not sufficient to deny his claim because neither reviewing physician actually stated that Wiggin does not experience significant pain, only that the etiology of the pain cannot be explained by diagnostic findings. (Pl.'s Motion at 7 & n.3.) Wiggin also asserts that Dr. Katz and Dr. Ramanujam did not give sufficient weight to

---

[6] Wiggin says that none of Aetna's consulting physicians has expertise parallel to Dr. Starbird when it comes to measuring the vocational impact of mental health conditions and symptoms. The two problems with this argument are (1) it is not necessarily true when one includes Dr. Schnur, who appears to have comparable mental health credentials and (2) Wiggin's record reference to Dr. Starbird's notes does not actually identify any supportive, claim-specific findings or opinions that would contradict Dr. Schnur's opinion.

FNP James's opinion of disability based on the combined impact of physical and mental conditions.  (Id. at 8-9.)  However, the Court cannot reasonably conclude on this record that the opinions offered by Drs. Katz and Ramanujam in the 2012 timeframe (including their unrebutted representations concerning Dr. Gillis's similar opinion) are not substantial evidence in support of Aetna's benefit determination just because FNP James opined otherwise, particularly when the opinion of Dr. Schnur is added with respect to what the mental health records indicate, or fail to indicate.  "Nothing in [ERISA] . . . suggests that plan administrators must accord special deference to the opinions of treating [practitioners]."  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003).

## CONCLUSION

A review of the administrative record reveals that substantial evidence supports Aetna's adverse benefit determination.  Consequently, I recommend that the Court grant Aetna's Motion for Judgment (ECF No. 25) and deny Wiggin's Motion for Judgment (ECF No. 24).

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

October 7, 2013